***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stanback with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as: *Page 2 
 STIPULATIONS
1. All parties are properly brought before the Industrial Commission, are subject to and bound by the provisions of the Worker's Compensation Act, the Commission has jurisdiction over the parties and of the subject matter, and the Employer-Employee relationship existed between Plaintiff and Defendant-Employer at the time of Plaintiff's injury.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties. Neither of the parties in this action is appearing in a representative capacity.
3. Plaintiff began work for Defendant-Employer on November 18, 1997, on a part-time basis as a switchboard operator. She went to full-time work for Defendant-Employer as a Support Assistant I in the I/T Control and Administration Section on April 26, 1999. She was terminated by Defendant-Employer on March 1, 2002.
4. On November 23, 1999, Plaintiff sustained a compensable injury by accident arising out of and in the course of her employment, which the defendant accepted as compensable as evidenced by the Form 60 filed in this matter on December 31, 1999. Plaintiff never returned to work for Defendant-Employer. Defendants were paying Plaintiff compensation for N.C. Gen. Stat. § 97-29 benefits of $ 293.92 per week pursuant to this Form 60 based on an average weekly wage of $440.86 until approval of the Form 24 of August 23, 2002, suspending benefits as of July 5, 2002.
5. Plaintiff first requested authorization for medical treatment or a change of treating physician from the Industrial Commission with the filing of the Form 33 on December 31, 2002.
6. Documents stipulated to by the parties and received into evidence include the following, consisting of seventeen hundred twenty-three pages of exhibits:
 a. Industrial Commission Forms and Orders pertaining to this claim:
 1. Form 60; filed 12/13/99 *Page 3 
 2. Form 18; filed 2/5/00
 3. Administrative Order on Form 24 Application; filed 3/15/00
 4. Defendants' Form 24 Application; filed 7/5/02
 5. Plaintiff's response to Defendants' Form 24; filed 7/22/02
 6. Defendants' additional documentation for Form 24 hearing; filed 8/12/02
 7. Administrative Order on Form 24 Application; filed 8/23/02
 8. Plaintiff's Form 33; filed 10/15/02
 9. Plaintiff's Medical Motion; filed 11/12/02
 10. Defendants' response to Plaintiff's Medical Motion; filed 12/9/02
 11. Plaintiff's Form 33; filed 12/31/02
 12. Plaintiff's response to Defendants' 12/9/02 response to medical motion; filed 1/3/03
 13. Defendants' Form 33R; filed 1/20/03
 14. Defendants' response to Plaintiff's response; filed 1/21/03
 15. Administrative Order, filed 2/25/03
 b. Employment and wage records, Form 22, and related correspondence pertaining to this claim
 c. Workers' compensation and medical payment records
 d. Rehabilitation reports and Correspondence:
 1. Intracorp Vocational Rehabilitation
 2. RSKCo. Medical Case Management
 3. Attorney Correspondence dated April 24, 2003, and May 12, 2003 regarding Plaintiff working from home. *Page 4 
 e. All medical records, medical evaluation reports, and correspondence pertaining to Plaintiff:
 1. Raleigh Community Hospital: 9/12/98 — 11/24/99
 2. Wake Medical Center: 12/1/99 — 2/11/00
 3. Raleigh Associated Medical Specialists: 11/30/99 — 1/10/02
 4. Stokes Regional Eye Center: 10/31/01
 5. Duke University Medical Center: 9/4/96 — 6/12/00
 6. Pee Dee Surgical Group: 1/22/02 — 6/20/02
 7. Clarendon Memorial Hospital: 4/5/99 — 11/24/01
 8. McLeod Regional Medical Center: 4/12/01 — 6/25/02
 9. McLeod Rehabilitation Services: 9/27/00 — 8/11/01
 10. Good Samaritan Hospital: 6/21/00
 11. Triangle Gastroenterology: 2/14/00 — 10/17/00
 12. Lake Marion Primary Care: 7/18/00 — 1/28/03
 13. Raleigh Neurology Associates, P.A.: 2/4/97 — 6/14/00
 14. Raleigh Neurosurgical Clinic, Inc.: 12/16/98 — 2/8/00
 15. John Hopkins Medicine: 3/23/00 — 3/11/02
 16. HealthSouth Rehabilitation Hospital: 1/16/01 — 2/16/01
 17. ARI Medical Case Addendum: 12/1/99 — 3/12/01
 18. Tar Heel Home Health: 5/2/00 — 8/18/00
 19. Susan O. Kesling, C.C.S.W.: 1/25/99 — 9/5/00
 20. Carolina Rehabilitation Associates, P.A.: 8/9/99 — 9/22/99 *Page 5 
 21. Pee Dee Gastroenterology: 5/3/02 — 6/25/02
 22. Complex Medical Evaluations: 2/12/01
 23. Carolina Constipation Center/Dr. Lahr: 1/10/03
 24. WakeMed Home Care
 25. Dr. Winston Wallace Vaught, Jr.: 4/11/01 — 9/25/01
 26. Tuomey Regional Medical Center: 3/5/91 — 7/22/95
 27. Medical University of SC: 10/24/89
 28. Florence Orthopaedic Associates: 8/23/89 — 4/4/96
 29. SC Urological Consultants, P.A.
 30. Christian Counseling Service
 31. Clarendon County DHEC Home Health: 7/12/00
 32. Post Trauma Resources
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, Plaintiff was forty-five years old, living in Florence, South Carolina. She has a high school diploma, along with certificates qualifying her as a nurse's assistant, data processing, machine operation, and teacher's aide.
2. Plaintiff was rendered a paraplegic in 1989 as a result of a car accident in South Carolina, which is not related to the instant claim. As a result of said accident, Plaintiff sustained a burst fracture of the T-12 vertebra that was corrected with a spinal fusion. Additionally, Plaintiff's sister was killed in said accident. Plaintiff underwent extensive rehabilitation, and improved to a point by 1991 where she could begin to engage in educational and volunteer activities. Part of the *Page 6 
reason she was able to engage in such activities was because she developed the ability to anticipate bowel movements thereby avoiding embarrassing accidents. Plaintiff maintained a positive attitude despite her paraplegia, and was even crowned "Miss Clarendon County" in a wheelchair pageant.
3. Plaintiff moved to Raleigh, North Carolina in 1996. She was living independently and found employment in Raleigh. She worked at B.T.I., FEMA and Rex Hospital. She also received a certificate in data processing.
4. Plaintiff began working for Defendant-Employer on November 18, 1997 on a part-time basis as a switchboard operator. She went to full-time work for Defendant-Employer as a Support Assistant I in the I/T Control and Administration Section on April 26, 1999.
5. In September of 1998, Plaintiff was involved in another non-work-related accident in which she was struck by a vehicle while attempting to cross the street in her wheelchair. Following this 1998 accident, Plaintiff was treated at the emergency room for complaints of thigh and right hip abrasions. A few weeks later, Plaintiff presented at Duke University Medical Center for development of phantom pain in her legs and arm and finger pain. Plaintiff was also treated by neurologist Dr. David Cook for a number of symptoms, including bowel problems. Plaintiff missed approximately one week of work due to anxiety concerning the 1998 accident.
6. Following the accident in September, 1998, Plaintiff obtained a full-time position with the Defendant-Employer and continued to receive bonuses and pay raises. As a part of her full-time work duties, Plaintiff was responsible for answering telephones, scheduling meetings, loaning equipment to employees, making deliveries, and maintaining the supply room. Despite reporting some bowel control issues from the September 1998 accident, Plaintiff did not have to wear Depends undergarments or "chucks" bed pads, and she was not having pain or issues with paraplegia, except not being able to walk. Plaintiff was also in rehabilitation to learn how to walk with long leg braces. *Page 7 
7. On or about November 23, 1999, Plaintiff was asked to hand deliver a package of diskettes to a co-worker who was to meet her at the corner where the Chamber of Commerce is located on Salisbury Street in Raleigh. She reached a crosswalk with a stoplight, and before crossing the road upon seeing the walk sign, she first waved at the driver of a van who had the red light to signal that she would be crossing, and then began crossing the street. As she went past the front of the van, it started to hit her wheelchair. The van proceeded to move forward and hit her chair repeatedly, eventually knocking the wheelchair over as Plaintiff sat in it. Plaintiff kept screaming at the driver to stop. When the van knocked the wheelchair out of its upright position, the wheelchair was under the front bumper. The wheelchair was stuck under the van, preventing the van from moving forward. The van's passenger then got out to see what was wrong and discovered the Plaintiff.
8. Emergency services arrived at the scene and took Plaintiff to Raleigh Community Hospital (RCH). Plaintiff was examined at the RCH emergency room by Dr. Scott G. Kirby. The RCH records indicate that Plaintiff suffered from an abrasion to her right elbow, muscle spasms in her abdomen, lower back pain, and pressure in the lower buttock area. Dr. Kirby consulted with a Dr. Moser as to whether Plaintiff had a new fracture at the L2 level, and referred her to follow up with Dr. Cook the following morning.
9. On November 24, 1999, Plaintiff returned to RCH with pain and muscle spasms in her neck and lower back, and with leg spasm when she leaned down. She was given Soma and Vicodin and released to follow up with her doctor.
10. On December 1, 1999, Plaintiff presented to the WakeMed Hospital Emergency Room as a result of continued back pain. On December 9, 1999, Plaintiff again presented to WakeMed for treatment and evaluation of severe back pain that she began to suffer following the November 23, 1999 motor vehicle accident. She was admitted by her family doctor, Charles A. *Page 8 
Cook, M.D. Upon admission to WakeMed, Plaintiff reported that she had increased back pain and changes with her bowel movements, specifically, that she had a reduction in her usual sensation to defecate. Dr. Cook had examined Plaintiff at his office prior to the admission and noted that Plaintiff "showed some diminished rectal sphincter tone." After reviewing a CT exam, Dr. Cook concluded that Plaintiff had acute changes and probable displacement of a spine fixation apparatus. He referred her to Robin Koeleveld, M.D., a neurosurgeon, and Dr. David Cook, a neurologist.
11. Dr. Koeleveld examined Plaintiff on December 10, 1999. His impression was that as a result of her 1999 accident, Plaintiff developed a new thoracolumbar fracture at T12, L1-2 and that the trauma from the accident had kicked out the left Harrington rod that had been placed in Plaintiff's spine during the course of her earlier spinal surgery. He noted that this was causing her lower back pain and rectal numbness, and he prescribed a brace to allow the fracture to heal.
12. Gregory M. Bertics, M.D., a neurologist and Dr. David Cook's partner, examined Plaintiff on December 11, 1999. She reported to Dr. Bertics that she had lost the baseline sensation for bowel movements that she had had prior to the November 23, 1999 accident. Dr. Bertics reviewed Dr. Koeleveld's dictation and deferred to Dr. Koeleveld as he felt that Plaintiff's condition was a surgical problem.
13. Plaintiff was released from WakeMed on December 16, 1999. She received home health care services from Optima for brace education, bowel movement assistance and foley catheter care. Dr. Koeleveld saw Plaintiff in a follow-up visit on December 29, 1999. At that time, Dr. Koeleveld determined that there had been no acute change in the positioning of the Harrington rods, but that Plaintiff was suffering from an acute fracture at the T12-L1-2 levels. Dr. Koeleveld released Plaintiff to return as needed on February 8, 2000.
14. Plaintiff continued to experience chronic back pain, and as a result, Dr. Charles Cook referred her to David Cohen, M.D. at Johns Hopkins Hospital in Baltimore, Maryland. Dr. *Page 9 
Cohen is an orthopedic surgeon with a specialty in adult spine surgery. Dr. Cohen first examined Plaintiff on March 23, 2000. At that time, Plaintiff informed Dr. Cohen that she noted an increase in back pain after coming out of the brace. She also told Dr. Cohen that, since the work accident of November 23, 1999, she had lost the perirectal sensation that allowed her warning when she was about to have a bowel movement. As a result, she had lost control of her bowel movements. Dr. Cohen ordered a CT myelogram and wanted to see her after the CT exam results were received.
15. Plaintiff returned to Dr. Cohen on May 10, 2000. After reviewing the CT results and consulting with another doctor at Johns Hopkins, Dr. Cohen recommended surgery to decompress the spinal cord for her posterior discomfort. Dr. Cohen performed a T12 corpectomy with anterior spinal fusion at T11-L1 on June 17, 2000. At her six-week follow-up appointment on July 25, 2000, Plaintiff reported that the surgery had provided relief for her back pain.
16. Plaintiff moved to South Carolina in the summer of 2000, after her June 17, 2000 surgery. She began to see Raymond Sy, M.D., her family practitioner, on July 18, 2000, for a general check up and for referrals. Dr. Sy is board-certified in internal medicine and cardiovascular disease. At the time Dr. Sy began treating Plaintiff, she was having bouts with nausea and vomiting, and Plaintiff was also treated for severe depression. Plaintiff also had complete bowel and urinary incontinence, even though Dr. Sy's medical notes do not indicate bowel incontinence until some time in 2002. At one visit, the Plaintiff had a loss of bowel control while in the waiting room of his office and had to be cleaned. Dr. Sy indicated that prior to her mother's death, Plaintiff's mother would clean her if she had an accident.
17. Dr. Sy was of the opinion as of April 23, 2003 that due to Plaintiff's bowel incontinence and depression, she was unable to work. In his deposition testimony, Dr. Sy testified, and the Full Commission finds as fact, that plaintiff's bowel incontinence became worse after the November 1999 accident. Thus, the Full Commission finds that plaintiff's incontinence is causally *Page 10 
related to the November 1999 accident. Dr. Sy further indicated that Plaintiff is not able to work in a public setting but that she may be able to work at home. Also, due to her post-traumatic stress disorder resulting from the November 1999 accident and because of her anger, Plaintiff was not able to work or focus on work. Dr. Sy indicated that Plaintiff's condition probably worsened after the November 1999 accident. Dr. Sy has treated Plaintiff one to two times per month since 2000.
18. At her six month follow-up appointment with Dr. Cohen on November 14, 2000, Plaintiff reported that she was feeling more bowel sensation, but that she was having trouble re-socializing to her job due to her continuing bowel problems. Dr. Cohen encouraged her to continue her physical therapy, and advised her that it could take up to one year to see what type of recovery she would make. Plaintiff reported that her bladder was holding water, but that her bowels remained incontinent at her one-year follow-up appointment on March 28, 2001. At her two-year follow-up appointment with Dr. Cohen in March of 2002, Plaintiff again expressed more relief from her back pain and that she was using suppositories in order to have bowel movements. Dr. Cohen considered Plaintiff to have reached maximum medical improvement with respect to her loss of bowel sensation as of the March, 2002 visit.
19. As of the last visit with Dr. Cohen, which was held the week before his deposition on May 19, 2004, Plaintiff was still performing intermittent catheterization and maintained her loss of bowel sensation. At the time of this visit, Dr. Cohen did not recommend vocational retraining for the Plaintiff.
20. On February 12, 2001, Plaintiff attended a second opinion evaluation as requested by Defendant with Robert W. Elkins, M.D. Dr. Elkins did not provide treatment, but did provide his opinion that Plaintiff had reached maximum medical improvement of her work-related injury. Dr. Elkins rated Plaintiff as having a thirty percent (30 %) impairment to her spine for the new injury of November 23, 1999. Dr. Elkin's opinion was to a reasonable degree of medical certainty. *Page 11 
21. Defendant assigned vocational rehabilitation counselor Betty H. Derrick to Plaintiff in or around March 2002. Ms. Derrick completed a vocational assessment on April 3, 2002 then transferred the file to vocational rehabilitation counselor Frances Somogyi, a case manager with Intracorp, on April 16, 2002. Ms. Somogyi is a Certified Rehabilitation Counselor and Certified Case Manager. Plaintiff repeatedly informed Ms. Somogyi that she felt she could not participate in vocational rehabilitation due to her bowel incontinence.
22. Plaintiff had just begun a bowel incontinence program when Ms. Somogyi contacted her to begin vocational rehabilitation. As part of her bowel program, Plaintiff had to take a laxative everyday. Currently, she does not take one everyday, but still has to take one regularly or she will be constipated and will not be able to have bowel movements.
23. The laxative makes it very difficult for Plaintiff to go out to apply for employment due to her frequent, unpredictable accidents. Plaintiff describes an accident as loose stool, akin to that of an infant's stool, which leaks outside of the diaper. When she has such an accident, it takes a long time to clean the stool from her chair and herself. Before her mother passed away, Plaintiff's mother could clean Plaintiff in a few minutes, but when Plaintiff has to clean the accidents on her own, she has to go home so that she can lie on her bed in order to clean herself and change her clothes. She then washes her clothes and bed linens and cleans the bathroom. Having these accidents in public is degrading and humiliating to Plaintiff. There was such an incident at Wal-Mart, where she was in line buying Depends when she had a bowel movement. The smell upset her because of the offense she believed it was causing the other people waiting in line.
24. During the course of her vocational rehabilitation program with Ms. Somogyi, Plaintiff had several instances of non-compliance. Plaintiff did not register with a job seeking service as requested by Ms. Somogyi; Plaintiff did not place applications with potential employers; she did not register for an on-line tutorial for upgrading her keyboarding skills, and she did not *Page 12 
attend two interviews that were scheduled. At the time Plaintiff was under an Order of Cooperation dated March 15, 2000 entered by former Special Deputy Commissioner Gina Cammarano. As a result of her non-compliance, defendants filed a Form 24 Application to Terminate or Suspend Payment of Compensation, and said application was granted per Order dated August 23, 2002, suspending benefits as of July 5, 2002. At the time of the entry of the Order of August 23, 2002, Plaintiff's non-compliance and refusal to comply with vocational rehabilitation was not justified, and said Order was properly granted.
25. Despite Plaintiff's bowel incontinence and loss of sensation, it is Ms. Somogyi's opinion that Plaintiff is able to obtain a job, and there are employers who would offer Plaintiff employment in the wage range of $450 to $500 per week, in the Florence, South Carolina area where Plaintiff currently resides. However, based upon the difficulties enumerated herein (principally, Plaintiff's degree of incontinence), the Full Commission finds that defendants' vocational efforts should be limited to finding employment in which plaintiff can work at home, as recommended by Dr. Sy.
26. Plaintiff saw Christopher J. Lahr, M.D. of Complete Colon Care Carolina Constipation Center on August 15, 2002. She reported to Dr. Lahr that she "has leakage of liquid from the rectum daily, and usually must wear a pad. She wears a diaper most of the time." She returned to Dr. Lahr on September 19, 2002 where he adjusted her bowel medication regimen. On November 15, 2002, Dr. Lahr wrote a letter to Plaintiff's vocational rehabilitation counsel, Frances Somogyi to inform her that Plaintiff's "uncontrollable bowel activity will make it impossible for her to keep all of her appointments at times." Dr. Lahr saw Plaintiff in a one-year follow-up on August, 2003, and concluded that she continued to have fecal incontinence and re-adjusted her bowel regimen.
27. On May 28, 2003, Plaintiff attended a one-time independent medical evaluation *Page 13 
requested by Defendant with Roger Deal, M.D. and Lawrence Bergmann, Ph.D. of Post Trauma Resources. Dr. Bergmann is a licensed professional counselor but is not a licensed psychologist. After administering psychological testing to the Plaintiff, Dr. Bergmann interpreted the results to indicate that Plaintiff's depressive symptoms might be more severe that what she is reporting, mainly because Plaintiff wants to be viewed in a positive light. He further indicated that her symptoms are consistent with a person who had been exposed to traumatic events but that said symptoms may or may not be related to the November, 1999 accident. Dr. Bergmann further expressed that it was their "opinion that [Plaintiff] has not reached maximum medical improvement for psychological symptoms that developed after she was injured at work," and he recommended a six-to eight-month course of psychotherapy. Dr. Bergmann thinks that Plaintiff can participate in a job search from a psychological standpoint.
28. On October 3, 2003, Plaintiff attended a one-time evaluation requested by Defendant with Judd Adelman, M.D., a gastroenterologist. Dr. Adelman did not provide treatment, but he did express opinions regarding Plaintiff's condition. Dr. Adelman indicated that the Darvocet and Duragesic that Plaintiff had been taking could cause decreased bowel motility. Dr. Adelman could not relate Plaintiff's incontinence to the November, 1999 accident. However, the Full Commission gives greater weight to Dr. Sy, plaintiff's treating physician, in finding that Plaintiff's incontinence is causally related to the November 1999 accident.
29. At the time of his examination of the Plaintiff, Dr. Adelman felt that Plaintiff could participate in vocational rehabilitation and would do well in a sedentary work environment. He also thought that Plaintiff should be able to manipulate and stimulate bowel evacuations, and that the leakage Plaintiff was experiencing was probably due to new bowel waste coming down around existing constipated bowel. Despite his earlier stated opinions, Dr. Adelman indicated that he would defer to Dr. Cohen's opinion regarding what conditions may have resulted from Plaintiff's *Page 14 
November, 1999 accident, and he would defer to Dr. Cohen as to whether Plaintiff's loss of bowel sensation was permanent.
30. The greater weight of the evidence indicates that Plaintiff developed psychological problems after the injury by accident of November 23, 1999, and these problems were a proximate result of said injury by accident. As a result of these conditions, Plaintiff sought counseling from counselors Dianne Brown and Susan O. Kessling. The treatment provided by these counselors tended to effect a cure, give her relief, and lessen the disability she sustained with respect to her psychological problems.
31. The greater weight of the evidence indicates that as a result of the injury by accident on November 23, 1999, Plaintiff was and remains unable to work or earn wages in any capacity from that date forward and continuing. However, the greater weight of the evidence also indicates that Plaintiff unjustifiably refused to cooperate with vocational rehabilitation efforts from July 5, 2002, the effective date of the Order entered by the Executive Secretary's Office, until April 23, 2003, when her family physician and long-time treating physician, Dr. Sy, determined that she was unable to work. By April 23, 2003, Plaintiff's bowel incontinence and depression was and remained a significant barrier for her participation in vocational rehabilitation and obtaining employment, and therefore, Plaintiff was justified in refusing those services from that point in time forward. Thus, the Full Commission finds it proper to hold such vocational rehabilitation efforts in abeyance until such time that Dr. Sy, Plaintiff's primary treating physician, in conjunction with other physicians of specialty to whom he may refer Plaintiff for necessary medical testing and/or evaluation, determines that it is appropriate for Plaintiff to become involved in vocational rehabilitation activities.
32. The surveillance evidence in this case demonstrates that the Plaintiff is able to transfer herself from her wheelchair to her vehicle with assistance and to drive her vehicle on limited occasions and for short periods of time. The surveillance is not sufficient evidence to show that *Page 15 
Plaintiff is capable of full-time sedentary employment, nor does it damage Plaintiff's credible testimony regarding her bowel incontinence and the difficulty that incontinence would cause her in a work environment.
33. Plaintiff suffered a serious injury to her spine on November 23, 1999, and she immediately began having neurological problems. Already being a paraplegic, she rightfully was concerned with obtaining the best medical treatment possible, particularly since Plaintiff had lived very independently prior to the accident of November 23, 1999. The physicians chosen by Defendants did not provide all the necessary medical treatment that was required to effectively treat Plaintiff's injury and provide the relief she needed, so she properly sought the best medical treatment she could find through a referral to Johns Hopkins Hospital and specifically to Dr. Cohen. Dr. Cohen is Harvard trained, he is a full-time professor at Johns Hopkins Medical School, and he teaches, treats patients, and does research.
34. Dr. Cohen's treatment of Plaintiff, including the surgical procedure and all follow-up treatment, was directly related to her November 23, 1999 injury. Dr. Cohen noted objective evidence of the injury that required surgery, and the surgery was performed to remove the compression that was present on the spinal cord and to stabilize Plaintiff's spine to get the bones to heal together, so that she would not have any further progression of her kyphosis, any further worsening of her neurologic function, and to possibly aid in the recovery of some of her lost functioning. After the surgery, Plaintiff's pain was diminished, and she recovered part of her motor function. Dr. Cohen's treatment of the Plaintiff was necessary to effect a cure, provide relief and/or lessen Plaintiff's period of disability.
35. Plaintiff requested Industrial Commission approval of medical treatment as of December 31, 2002, which was within in a reasonable time considering the circumstances. Defendants were timely aware of the treatment Plaintiff received and Plaintiff's request for them to *Page 16 
authorize the same. Plaintiff had a serious injury that required major surgery and rehabilitation such that she had to move back in with her family in South Carolina, causing her a significant loss of independence. Plaintiff was dealing with her physical condition and relied upon her former attorney to represent her interests in her action before the Commission. Plaintiff's former attorney's delay in requesting authorization should not be imputed to Plaintiff.
36. Based upon the Form 22 submitted in this matter, along with the supplemental material provided by the defendants and plaintiff's response thereto, the Full Commission finds that where the employment prior to the injury extended over a period of less than fifty-two weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will thereby be obtained. The Full Commission finds that this method, more commonly known as "method two" is the appropriate means of determining Plaintiff's average weekly wage because Plaintiff's full-time employment with Defendant-employer was for less than fifty-two weeks prior to the injury. After her injury, Plaintiff has lost full-time wages (but not part-time wages) and, thus, should be compensated for her loss of full-time wages.
37. Based upon the second method of determining average weekly wage, Plaintiff's earnings from April 26, 1999, through the date of injury on November 23, 1999, total $15,258.00 during this 30 and 3/7 (30.4286) week period. Dividing by the number of weeks, the Full Commission finds that Plaintiff's average weekly wage is $501.44, which yields a weekly compensation rate of $334.30.
38. Plaintiff has argued that a $688.40 bonus she received in March 2000 should be applied in the calculation of plaintiff's 1999 pre-injury wages; however, Defendants have argued, and the Full Commission so finds, that such bonus was not paid until after the injury, and was essentially an award for good performance by plaintiff's entire department and, thus, is an award *Page 17 
that constitutes earnings in year 2000, not year 1999.
39. For her compensable injury by accident of November 23, 1999, Defendants paid Plaintiff compensation for N.C. Gen. Stat. § 97-29
benefits at the rate of $ 293.92 per week pursuant to a Form 60 based on an average weekly wage of $440.86 until approval of the Form 24 of August 23, 2002, suspending benefits as of July 5, 2002. Therefore, Plaintiff is entitled to the difference in compensation based on Defendants' underpayment, at the rate of $40.38 per week from the date of the injury, November 23, 1999, until July 5, 2002.
40. Defendant-Employer paid Plaintiff under a salary continuation program through the date of her termination from employment, March 1, 2002. Defendants are therefore entitled to a week-for-week credit for any amounts Plaintiff was paid under the salary continuation program through March 1, 2002.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On November 23, 1999, Plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with Defendant-Employer resulting in a new fracture in her thoracic spine at T12, significant thecal sac compression in the same area, alteration in her baseline bladder and bowel function, and depression. N.C. Gen. Stat. § 97-2 (6).
2. As a result of her compensable injury by accident, Plaintiff was totally unable to earn wages in any employment from November 23, 1999, and continuing to the present. However, as a result of her unjustified refusal to comply with vocational rehabilitation, Plaintiff is not entitled to temporary total disability benefits from July 5, 2002, the effective date of her termination of benefits based on the Form 24 Application and the resulting Order entered by the Executive Secretary's *Page 18 
Office, to April 23, 2003, the date by which Plaintiff's refusal to participate in vocational rehabilitation was no longer unjustified. Plaintiff is entitled to temporary total disability benefits at all other times since her injury by accident, including re-instatement of her benefits as of April 23, 2003, subject to a credit for Defendants as described herein. N.C. Gen Stat. §§ 97-29; 97-25.
3. Based upon the Form 22 submitted in this matter, along with the supplemental material provided by the defendants and plaintiff's response thereto, the Full Commission finds that where the employment prior to the injury extended over a period of less than fifty-two weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will thereby be obtained. N.C. Gen. Stat. § 97-2(5). The Full Commission finds that this method, more commonly known as "method two" is the appropriate means of determining Plaintiff's average weekly wage because Plaintiff's full-time employment with Defendant-employer was for less than fifty-two weeks prior to the injury. After her injury, Plaintiff has lost full-time wages (but not part-time wages) and, thus, should be compensated for her loss of full-time wages. Id. Based upon the second method of determining average weekly wage, Plaintiff's earnings from April 26, 1999, through the date of injury on November 23, 1999, total $15,258.00 during this 30 and 3/7 (30.4286) week period. Dividing by the number of weeks, the Full Commission finds that Plaintiff's average weekly wage is $501.44, which yields a weekly compensation rate of $334.30. Id.
4. Based on a compensation rate of $334.30, Plaintiff is entitled to payment of the difference in compensation based on Defendants' underpayment, at the rate of $40.38 per week from the date of the injury, November 23, 1999 until July 5, 2002, the effective date of her termination of benefits based on the Form 24 Application and the resulting Order entered by the Executive Secretary's Office. Plaintiff is then entitled to reinstatement of temporary total disability *Page 19 
compensation at the rate of $334.30 per week from April 23, 2003 until the present and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
5. Defendant-Employer paid Plaintiff under a salary continuation program through the date of her termination from employment, March 1, 2002. Defendants are therefore entitled to a week-for-week credit for any amounts Plaintiff was paid under the salary continuation program pursuant to N.C. Gen. Stat. § 97-42, from November 23, 1999 through March 1, 2002, to be applied towards the compensation Plaintiff was due for this period.
6. Plaintiff's request for approval from the Commission for authorization for her medical care was done in a reasonable time after receiving the treatment, considering the circumstances of her case.Schofield v. Tea Co., 299 N.C. 582, 264 S.E.2d 56 (1980). Therefore, Plaintiff is entitled to medical benefits commencing on December 31, 2002, the date she filed the Form 33 request for hearing, including psychological treatment, for her compensable injury by accident of November 23, 1999. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
7. As a result of her compensable injury by accident of November 23, 1999, Plaintiff sustained a thirty percent (30%) permanent partial impairment to her spine. N.C. Gen. § 97-31. However, plaintiff is deemed to have selected the more munificent remedy available to her at this time, which is temporary total benefits per N.C. Gen. § 97-29.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees approved herein, the defendants shall pay temporary total disability compensation benefits to the plaintiff in the amount of $334.30 per week for all periods beginning November 23, 1999 to July 5, 2002, and reinstatement of temporary total disability *Page 20 
compensation beginning April 23, 2003 at the same rate and continuing until further Order of the Industrial Commission. Defendants are entitled to a week-for-week credit for any amounts they have previously paid to Plaintiff pursuant to a salary continuation plan for the period November 23, 1999 through March 1, 2002. All amounts that have accrued shall be paid in one lump sum.
2. Defendants shall pay or reimburse the Plaintiff, provider, or insurance carrier for all past and future medical expenses occurring on or after December 31, 2002, the date Plaintiff filed the Form 33 request for hearing, including psychological treatment, related to the compensable injury by accident, including treatment provided by Dr. Charles Cook, Dr. Sy, Dr. Cohen, Johns Hopkins University Hospital, and all psychological counselors.
3. An attorney's fee in the amount of twenty-five percent (25%) of the compensation due Plaintiff under Paragraphs 1 and Paragraph 2 of this AWARD shall be deducted from the sums due Plaintiff and paid directly to the Plaintiffs' attorneys. All accrued attorney's fees shall be paid in one lump sum; thereafter, Plaintiff's attorney shall be paid every fourth compensation check due Plaintiff.
4. Defendants shall cease and desist from all vocational rehabilitation efforts until such time that Dr. Sy, Plaintiff's primary treating physician, in conjunction with other physicians of specialty to whom he may refer Plaintiff for necessary medical testing and/or evaluation, determines that it is appropriate for Plaintiff to become involved in vocational rehabilitation activities. At that time, that defendants' vocational efforts should be limited to finding employment in which plaintiff can work at home.
5. Based upon the Award provided herein, the Full Commission retains jurisdiction to address the issue of outstanding bills for medical compensation that have not been paid by Defendants. Upon receipt of this Opinion and Award, the parties, if necessary, may submit to the Full Commission a summary of all medical providers who have and have not been paid, and a *Page 21 
summary of treatments that have and have not been authorized.
6. Defendants shall pay the costs of this action.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER *Page 1